DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**HARRY HAHAMOVITCH, HHH DEVELOPMENT GROUP, INC., HHH FINANCIAL CORPORATION, INC., SOUTH SQUARE DEVELOPMENT, INC.** and **PLAZA LA MER, INC.,**
Appellants,

v.

**DELRAY PROPERTY INVESTMENTS, INC., SOSQ PROPERTY INVESTMENTS, INC., HATIM HASHWANI** and **ROBERT GEISERMAN,**
Appellees.

No. 4D13-3510

[April 15, 2015]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; David F. Crow, Judge; L.T. Case No. 501995006336AO.

Robert J. Hauser of Beasley Hauser Kramer & Galardi, P.A., West Palm Beach, and Robert A. Sweetapple and Alexander D. Varkas, Jr. of Sweetapple Broeker & Varkas, P.L., Boca Raton, for appellants.

Stephen A. Mendelsohn of Greenberg Traurig, P.A., Boca Raton, and Elliot H. Scherker, Brigid F. Cech Samole, and Rachel A. Canfield of Greenberg Traurig, P.A., Miami, for appellees Delray Property Investments, Inc., SOSQ Property Investments, Inc. and Hatim Hashwanti.

WARNER, J.

In this marathon litigation over agreements between appellants and appellees concerning the ownership in two commercial shopping centers, appellants challenge the final judgment awarding damages against them based upon fraud. They also contest the court's declaration of their rights under the profit participation agreements between the parties. First, appellants claim that the fraud claim should have been barred by a merger clause in the profit participation agreements. Second, they contend that the trial court erred in finding that the contract did not require the appellees to furnish financial information to the appellants for the purpose of exercising their contractual right to purchase the properties and that appellants could not exercise their right to purchase retroactively. As to the first claim, the merger clause would not bar a cause of action for fraud,

and in this case the fraud involved the closing of the property and not the subsequent participation interests to which the merger clause applied. As to the second claim, we agree with the trial court that appellants are not entitled to the requested relief of retroactively allowing them to exercise their rights to purchase. We affirm.

**Facts**

This case has a complex twenty-year history arising out of the sale of two commercial properties, Plaza La Mer in Juno Beach and South Square in Brooksville, Florida.[1] Harry Hahamovitch and his associates entered into contracts to purchase the two properties through two affiliated corporations, Plaza La Mer, Inc. ("PLM") and South Square Development, Inc. ("SDI"). To complete the purchase, however, Hahamovitch and his associates needed additional investors. They approached Hatim Hashwani to secure additional investors to provide financing. The investor whom Hashwani found did not want to enter into a partnership directly with Hahamovitch and his partners. Instead, the investor created Delray Property Investments, Inc. ("Delray") and SOSQ Property Investments, Inc. ("SOSQ") to be the assignees of the properties' purchase contracts and then to take title.

The parties signed Preliminary Participation Agreements on each of the shopping plazas to establish their rights and responsibilities for the completion of the purchase. Pursuant to these agreements, Hahamovitch agreed to assign his contracts to purchase the two properties to Delray and to complete specified "confirmations" prior to closing. One of the provisions dealt with the payment of brokerage commissions. Horizon Equities Group, Inc., a real estate brokerage firm, was entitled to a $144,000 commission on the closing of the sale of Plaza La Mer, but Hashwani's investor wanted to confirm that Hahamovitch would not receive any part of this commission. In the Preliminary Participation Agreements, the parties included a provision conditioning the closing on a confirmation that Hahamovitch would not receive a commission:

> Written confirmation from Horizon Equities Group, Inc., that the commission due it (the "Horizon Commission") from the Purchaser under the Agreement is $144,000. By executing this instrument on behalf of Assignor, Harry H. Hahamovich represents and warrants unto Assignee [Delray] that neither he nor any other entity in which he has an equity interest

---

[1] We are told this is the oldest active case in Palm Beach County.

2

(including without limitation, Assignor [Plaza La Mer]) is receiving any portion of the Horizon Commission.

The preliminary agreement also obligated the parties to enter into a profit participation agreement.

The evidence in the record shows that the purchase price for Plaza La Mer was $3.6 million, and Delray executed a $2.5 million mortgage. It also paid considerable costs to close. The purchase price of South Square was less, but also included cash plus a $2 million mortgage. After the closing on the two properties, the parties entered into nearly identical Profit Participation Agreements ("PPAs") for each shopping plaza. Delray was designated as the owner of Plaza La Mer, and SOSQ was designated as the owner of South Square. PLM and SDI, the corporations owned by the Hahamovitch associates, along with Hashwani, were designated as "participants." The agreements recognized that the participants were instrumental in securing the property for the owners, and the owners intended to provide for the participants to benefit from the shopping centers. Rather than give the participants equity grants, the agreement provided that each participant would receive a portion of net cash flow and net proceeds after reimbursement of the owner's outstanding capital including a compounded return on investment. The specific terms of the PPAs are most relevant to the second issue on appeal and will be discussed later in this opinion.

In addition, HHH Management, a corporation owned by Hahamovitch, became the manager of both shopping centers, responsible for the day-to-day operations. The Management Agreements for the properties required HHH Management to account to the owners for the income, expenses, and distributions on each property. The manager kept all the books and records of the shopping centers and was required to make quarterly reports to the owners of income, expenses, and distributions.

A year and a half later, the owners discovered that Hahamovitch had received a commission on the sale in violation of the provisions of the preliminary agreement. They terminated HHH Management as manager of the properties and filed suit in 1995 against Hahamovitch, PLM, and others connected with the Plaza La Mer purchase, because of the receipt of a commission by Hahamovitch. They alleged fraud and sought damages together with rescission of both Profit Sharing Agreements because of the misrepresentations of Hahamovitch.

The defendants responded, and PLM and SDI filed a counterclaim against Delray and SOSQ, respectively, claiming the right to an accounting

3

to determine what distributions of profits were owed to those companies. In 1998 they filed an amended counterclaim for declaratory judgment in which they alleged a need for the court to construe the PPAs. They contended that they were entitled to information on net cash flow, net proceeds, or rent rolls so that they could determine whether to exercise option rights under the PPAs to extend a purchase offer to the owners for the properties. They alleged that Delray refused to provide the information which in good faith it should be required to give to them. They requested the court to declare the validity of the PPA and the rights of the parties to the contract. As well, they requested "incidental damages," costs, and attorney's fees.

Delray's claims of fraud and breach of contract went to trial in 2003. An employee of Horizon Equities, the purported broker, testified that neither he nor Horizon was involved in the real estate transaction but were given $44,000 of the $144,000 commission to offset monies that Hahamovitch owned him for other services. He explained that none of the money he received had anything to do with the Plaza La Mer sales commission. He testified that he was directed (by Hahamovitch or his associate) to write a check for $100,000 to a company called Rodan Development to repay monies Hahamovitch had borrowed from Rodan in the initial stages of contracting to purchase Plaza La Mer. Hahamovitch gave contrary testimony that Horizon earned the commission and that he was merely a "clearinghouse" for the funds but didn't receive a commission.

The jury rejected Hahamovitch's testimony and returned a verdict in favor of Delray and SOSQ finding that the appellants each had conspired to defraud Delray and SOSQ. They awarded $144,000 in damages to Delray. They awarded nothing to SOSQ, because the commissions weren't paid for the South Square property. Entry of judgment was deferred pending hearing on the plaintiffs' (appellees) requests for rescission of the PPAs and the counterclaimants' (appellants) request for an accounting.

The trial court then ruled that Delray and SOSQ could not rescind the PPAs and at the same time retain the properties. It ruled that all three of the agreements—the Preliminary Participation Agreements, the Profit Participation Agreements (PPAs), and the Management Agreements—had to be construed as one transaction, and Delray and SOSQ could not rescind only the PPAs. The court ruled that, despite the fraud regarding the commissions on the sale, the PPAs were enforceable. The court also ruled that the agreements entitled the defendants/counterplaintiffs to an accounting to determine the net cash flow and whether distributions were owing to PLM or SDI from the respective shopping centers. However, after

4

a trial in 2004 where both sides presented substantially dissimilar accountings, the court rejected the accountings offered by both sides and appointed a neutral CPA.

The final hearing on the accounting did not take place until 2010. The CPA issued a report only as to Plaza La Mer. The report calculated the net cash flow from 1993 to 2010, as well as the outstanding capital, returns, and distributions to owner. As of the time of trial on the accounting, Delray's outstanding capital plus accrued return amounted to $23,348,924. Those calculations showed that PLM was not owed any distributions, based upon the PPA. The court adopted the report. In its order the court noted that, although no accounting had been performed regarding South Square, the parties had stipulated that there was no net cash flow due to SDI. The parties had no agreement as to the amount of outstanding capital and return regarding South Square.

After the accounting was complete, PLM and SDI then asked the court to hear and rule on the remainder of their declaratory judgment count. At a further trial in 2013, they claimed that the PPAs provided PLM and SDI the option to purchase the properties, but they needed to know the net cash flow in order to construct an offer. They claimed that because Delray had refused to provide them with any accountings or information in 1995, Delray breached its good faith under the contract. Although it now had the accounting information, in order to remedy Delray's failure to provide the information in 1995 and repudiation of the contract, they argued, PLM and SDI should be entitled to exercise what they claimed was their option to purchase the properties in accordance with the agreements' terms as of 1995. Hahamovitch testified that he would have needed information to make an offer and would have bought the property in 1996 after he was excluded from the operations. On the other hand, he also testified that he would have made an offer based upon the replacement building cost per square foot, not on the income approach to valuation. He did not make any offers at the time, because he was awaiting the court's determination of the validity of the contract.

Delray objected that this claim had not been made in the pleadings. It further maintained that there was no right to an accounting under the contract for the purposes that PLM and SDI now espoused, i.e. so that they could create an advantageous offer.

The court entered a final judgment in favor of Delray and SOSQ. It found that PLM and SDI were requesting relief that they had not pled in their counterclaims. There, they had requested that the court declare the PPAs valid; that it determine the rights of the parties as expressed in the

agreements; and that the court reserve jurisdiction to provide equitable relief. Whereas at trial, PLM and SDI were requesting a determination that the PPA required accountings for the purpose of determining the purchase price for claimed options and that this included a "right to purchase the properties at some unspecified date in the future retroactive to valuations in the 1995/1996 time period." The court concluded that this claim had not been pled. Instead, PLM and its associates had spent years seeking an accounting for the purpose of determining their share of the profits and turned to the option to purchase claim only after the accounting showed that no funds were due. The court concluded that the claims "attempt to deprive the Plaintiffs [appellees] of their shopping centers at artificial and stale 18 year old valuations." The court found that to permit an amendment to the pleadings to assert such claims would be unfair and severely prejudicial to Delray and SOSQ.

Moreover, the court found that the PPAs did not grant the options that PLM and SDI claimed. The agreements provided for only a conditional option to PLM or an affiliate, and neither PLM nor SDI, nor an affiliate, complied with the terms of the option by making an offer. The court found that the evidence did not support an ability to perform, other than pure speculation.

Finally, the court ruled the PPAs did not impose a duty on the plaintiffs/appellees to provide accountings for the purpose of making an offer on the property. It found, "This Court's previous Order granting an equitable right to accounting for a determination of whether there are distributions of net cash flow due under the Profit Participation Agreements is substantially different than an accounting for the purpose the Counter-Plaintiffs now contend." It reasoned that PLM or SDI could have made an offer subject to due diligence on income and expense information, or could have made an offer based upon fair market value. The court determined that "[a]ny purported retroactive exercise of such alleged option is purely speculative, and not supported by the evidence nor from the unambiguous language of the Agreements."

In the decretal portion of the order, it entered judgment against all of the appellants on the $144,000 jury verdict on the fraud claim. It declared that the PPAs were valid and enforceable but that they did not grant an exclusive option to purchase the subject properties for the time period of 1995/1996 or any other time in the past to be exercised at some time in the future. It concluded that Delray and SOSQ were not required to provide an accounting of net proceeds until a refinancing or sale occurred, nor were they obligated to continually update an accounting of net cash flow. Instead, should PLM or SDI desire such accountings, Delray and

SOSQ must make their financial records available to PLM or SDI who may, at their cost, update the accountings.

In their appeal from the final judgment, the appellants – Hahamovitch, PLM, SDI, and associated entities – raise only two issues. First, they contend that the breach of contract and fraud claims regarding the brokerage commission should have been barred due to a merger clause in the PPAs. Second, they argue that the court erred in: (1) failing to find that Delray and SOSQ had a duty to provide an accounting to PLM or SDI for the purpose of exercising their purchase rights under the PPAs; (2) refusing to require Delray and SOSQ to provide net cash flow accountings in the future; and (3) failing to grant PLM and SDI relief by allowing them to exercise their purchase rights under the PPAs by using the rents, net cash flow, and outstanding capital figures from 1995/1996 when the PPAs were first repudiated by the appellees.

## Fraud Judgment and Merger Clause

The appellants contend that Delray's and SOSQ's complaint for breach of contract and fraud failed to state a cause of action, because the representation or warranty with regard to the brokerage commissions contained in the Preliminary Participation Agreement was not repeated in the PPA, which contained a merger clause. We disagree that the merger clause extinguished a claim based upon the representation in the Preliminary Participation Agreement. In any event, the existence of a merger clause does not prevent a cause of action for fraud.

The Preliminary Participation Agreement had two purposes. First, it served to assign the rights to the contract for sale of the properties from HHH Development to Delray and SOSQ. The agreement contained provisions for "Confirmations" which must be received prior to closing on the properties, including the confirmation with respect to the brokerage commission. Second, it provided that the Assignees and Participants would enter into a PPA and a Management Agreement, copies of which were attached to the Preliminary Agreement.

The PPAs each contained a merger clause which provided:

> This Agreement embodies and constitutes the entire understanding among the parties *with respect to the Participation Interest*, and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, *relating to the Participation Interest* are merged into this Agreement.

7

(Emphasis supplied). Because the merger clause was limited to those representations relating to the participation interests, it did not cover representations with respect to commissions paid at the closing of the sales. The payment of the commission was a matter affecting the closing of the property and not the subsequent participation agreements.

In addition, the Preliminary Participation Agreements stated, "[T]his agreement and the Assignment Agreement shall be the controlling instruments . . . until . . . closing[.]" The closing occurred on August 9, 1993, and in reliance on the representation of no commission being paid to Hahamovitch, Delray paid the $144,000 commission to Horizon. Once the closing took place, there was no reason to include the representation of "no commission" in the PPAs. The fraud had already occurred.

Finally, even if the fraud claim had not occurred prior to the signing of the PPAs, the argument is still without merit because the existence of a merger clause does not prevent a cause of action for fraud. *See Noack v. Blue Cross & Blue Shield of Fla., Inc.*, 742 So. 2d 433, 434 (Fla. 1st DCA 1999), citing *Wilson v. Equitable Life Assurance Soc'y*, 622 So. 2d 25, 27 (Fla. 2d DCA 1993) (it is a well-established rule that "alleged fraudulent misrepresentations may be introduced into evidence to prove fraud notwithstanding a merger clause in a related contract"). For all of these reasons, we affirm the judgment of fraud entered by the court.

## Declaratory Judgment

PLM and SDI sought a declaration of their rights under the PPAs. Because both PPAs contain essentially similar provisions, we will utilize the terms of the Plaza La Mer PPA in analyzing the issues presented.

The purpose of the PPAs was to recognize and reward the Participants, PLM and Hashwani, as instrumental in arranging the acquisition of the properties by Delray. It allowed for the Participants to share in the profits, if any, of the shopping center, and it also provided for HHH Management to be the manager of the property. HHH Management was an affiliate of PLM.

The PPAs defined terms which are central to the rights of the parties under the agreement. We paraphrase portions of those terms.

<u>Outstanding Capital</u> is "an amount equal, as of the date of computation, to the Invested Sum less the portion of the Invested Sum which has been previously returned to the Owner." The <u>Invested Sum</u>

constituted the initial amount invested by Delray of $1,570,000 plus any accrued returns. Return was defined as "a sum which equals the Outstanding Capital multiplied by thirty percent (30%), compounded annually."

Net Cash Flow was to be computed on a quarterly basis and according to generally accepted accounting principles. It amounted to the income generated from the property less expenses. The actual definition is much more detailed, but as there is no issue on appeal as to its calculation, it is sufficient to generalize this term. Net Proceeds of a sale of the property constituted the sale price less an amount to satisfy any mortgages on the property and the standard costs of sale, such as recording costs, taxes, etc.

The Participation Interest amounted to distributions which would be paid to Participants pursuant to the terms of the agreement, specifically those relating to the payment of any net cash flow and net proceeds upon a sale or refinancing. Delray granted to PLM an 81.75% share of the Participation Interest in the Net Cash Flow and Net Proceeds, after the owner's outstanding capital and return were paid, and the Owner agreed that it would be responsible to see that the Participation Interest would be timely paid to the Participants. Net Cash Flow was to be distributed no later than 45 days after the end of each Calendar Quarter.

The distribution of funds differed depending upon whether they came from Net Cash Flow or Net Proceeds of a sale of the property. Net Cash Flow would be distributed in the following order:

(1) To Owner to the limit of the accrued and unpaid Return; if any excess remained, then
(2) To the Owner to the limit of the Outstanding Capital; if any excess remained, then
(3) To Participants in an amount equal to the Return distributed to the Owner; if any excess remained then
(4) 50% to the Owner and 50% to the Participants (of which PLM would receive 81.75%).

In the case of a sale, the distribution order was different with respect to the Owner. The Net Proceeds would first be paid to the owner to the limit of Outstanding Capital and then to the Owner to pay any accrued and unpaid Return. Thereafter, the distribution to the participants followed the same priority as with Net Cash Flow.

9

Section 3B and 3C of the PPA established the criteria for the sale of the properties. In 3B, PLM could force a sale at a minimum price, but it could require the Owner to sell to a PLM affiliate only if it also offered to the Owner the right to purchase its participation interest:

> B. Provided Owner receives Net Proceeds upon Sale of an amount not less than the Outstanding Capital plus the Return, PLM can require Owner to sell the Property at any time. . . . Further, PLM can only require Owner to sell the Property to an entity in which PLM and/or Harry H. Hahamovitch has an equity interest (an "Affiliate") if: (i) PLM provides Owner with a copy of the contract for the proposed sale to the Affiliate . . . ; (ii) PLM offers Owner the right to acquire PLM's share of the Participation Interest at a purchase price equal to the amount which it would receive in the event of and upon closing under the Affiliate Contract Offer; and (iii) Owner fails to accept the offer to purchase PLM's share of the Participation Interest within 30 days after the offer, or fails to close the purchase of PLM's share of the Participation Interest within 60 days after the offer. PLM shall have no further rights or interests hereunder in the event of, and following Owner's purchase of PLM's share of the Participation Interest pursuant to this paragraph.

In Section 3C the agreement provided that the Owner could not sell the properties without PLM's consent and required the Owner to give notice of its intent to accept any sale offer. PLM then had the right to purchase under the terms of the offer with a very detailed list of additional requirements.

The PPA did not provide for any reports to be distributed regarding Net Cash Flow. Instead, the Management Agreement required the Manager, a PLM affiliate, to provide operational reports to Delray, which included income, expense, and distributions. Thus, while everyone was working together, all parties would have received full information regarding the rents and expenses of the property. When Delray terminated HHH Management as Manager in 1995, the flow of information to PLM ceased.

PLM's 1998 counterclaim for declaratory judgment demanded that information, including Net Cash Flow and rent rolls, to determine "whether it wants to exercise its right to demand the sale of [the property] to [PLM] or one of its affiliated companies" pursuant to Section 3B. It alleged that Delray had repudiated the PPA by filing its complaint to seek the PPA's rescission. Because of Delray's failure to supply the information,

10

PLM alleged that in the event that PLM exercises its right to purchase, Delray should not be entitled to any Return until it complied with its contractual obligation to provide the information. It thus alleged that there was a need for a declaration of the validity of the PPA with the contractual obligations set forth in the declaration, i.e. the requirement to provide accounting information. It demanded as relief a determination of the validity of the contract and PLM's rights in it. It did not sue for breach of contract based upon Delray's repudiation of the PPA.

After the jury verdict on Delray's fraud counts, PLM pursued its claims for accounting and declaratory judgment. It consistently claimed that these were equitable claims that PLM had a right to profits. Although its rights to purchase were mentioned in argument, PLM sought the accounting because it maintained that it was entitled to profits. Its accounting expert determined that PLM was entitled to distributions from $5 million in net cash flow, but these calculations were rejected by the trial court. Further, the court rejected the contention in the complaint for declaratory judgment that Delray should not be entitled to any return because of its failure to provide financial information to PLM. The court said, "The court also finds there is no basis for Defendant's assumption [in its expert's accounting] that the net return as set forth in the agreement between the parties should somehow be reduced to 7.5% or 0% as of August 1995."

Thus, after the court accepted the neutral CPA's report that no distributions were due to PLM and that the agreement would not be construed to eliminate the stated Return in the agreement, PLM proffered a new argument to the court in pursuing its declaratory judgment count. It claimed that, because Delray did not produce the Net Cash Flow and financial information in the 1995/1996 time period when a PLM affiliate would have made an affiliate contract offer, the court should allow PLM or an affiliate to make an offer to purchase the properties at 1995/1996 valuations.

The trial court's final declaratory judgment found that PLM or SDI did not have a right to purchase the properties under the PPA, as they claimed, nor did the PPAs require an accounting for the purposes of allowing the Participants to exercise their purchase rights under the contract. Finally, the court concluded that the relief requested, allowing it to exercise its option to purchase the properties at 1995/96 values, had never been pled or tried by implied consent, and it would be inequitable for such relief to be granted.

The trial court interpreted Section 3B of the PPAs as providing a conditional option to an affiliate of PLM to purchase the property. We agree. PLM could require the Owner to sell the property if it received an offer from anyone which would result in minimum net proceeds sufficient to repay the Owner its outstanding capital plus accrued return.[2] But if an affiliate of PLM made an offer on the property at some price above the minimum specified in the contract, PLM was required to offer Delray the option to purchase its Participation Interest at the amount PLM would have received had Delray accepted the offer from PLM's affiliate, closed on the property, and net proceeds were generated. Thus, Section 3B of the PPA did not create an option for PLM to purchase the property. It created an option on the part of Delray either to sell the property to the affiliate or to buy out PLM. A PLM affiliate could purchase the property only if Delray chose not to exercise its option of buying out PLM.

With respect to the accounting, PLM makes two arguments. First, it was entitled to an accounting of the Net Cash Flow in order to determine its right to any distributions. The court agreed with this when it ordered the accounting in 2004, which was completed in 2010. Second, it contended that it needed the information to determine whether it wanted to engage an affiliate to make an offer on the property. As to the latter, PLM claims that Delray's failure to provide financial information constituted a violation of the implied covenant of good faith, because without that information it could not determine whether to make an offer on the property.

Florida contract law recognizes an implied covenant of good faith and fair dealing in every contract. *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n*, 94 So. 3d 541, 548 (Fla. 2012). "This covenant is intended to protect 'the reasonable expectations of the contracting parties in light of their express agreement.'" *Id.* (quoting *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1438 (S.D. Fla. 1996)). There are, however, two limitations on such claims: "(1) where application of the covenant would contravene the express terms of the agreement; and (2) where there is no accompanying action for breach of an express term of the agreement." *Id.* "A duty of good faith must 'relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.'" *Id.* (quoting *Ins.*

---

[2] Of course, PLM would have little reason to demand a sale at the minimum price, because that would yield no proceeds to PLM under the provisions of the agreement.

*Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001)).

We agree with the trial court that providing information for Net Cash Flow or rent rolls *for the purpose of determining an offer to purchase* was not required by the contract. In this case, the parties were dealing at arm's length, and Hahamovitch and his associates were exceptionally sophisticated in commercial lease properties. Hahamovitch was the manager of seventeen other shopping centers as well as Plaza La Mer and South Square. His company also managed Plaza La Mer and South Square until the termination of Management Agreement. As manager, the company negotiated all the leases and had intimate knowledge of the expenses, as well as the amounts for which comparable properties were renting. PLM, through its affiliate, had all of that information for the properties until HHH Management's ouster in 1995 and thereafter it could still rely on the sophisticated analysis of Hahamovitch and his companies. Moreover, there are multiple methods for determining the value of property—comparable sales, income capitalization, or replacement cost, to name the most common. A contract for purchase could have been made without the information Hahamovitch and his companies sought from appellees. Indeed, at the trial in 2013, Hahamovitch testified that he would have made an offer based upon the replacement cost of the property on a per square foot basis, not an income approach.

Although Section 3B provided a minimum price at which PLM could force the owner to sell or buy it out, in reality PLM would never itself offer the minimum price or force a sale, because it would not obtain any portion of the net proceeds under the distribution scheme in the PPA. All of the net proceeds would be paid to Delray for its outstanding capital and return. Thus, in order to maximize its own profit on the sale or buy-out, it must offer an amount significantly higher than the minimum.

What PLM did need to know was the value of Delray's Outstanding Capital, which included the original investment plus the return of 30% compounded annually. While its affiliate, HHH Management, was the manager, it had all of the information to calculate that amount. But even if it did not, it could easily calculate the maximum amount which it could be, i.e. the initial invested sum plus a 30% rate of return compounded annually.[3] For all of these reasons, we conclude that the trial court did not err in concluding that there was no obligation on the part of Delray to

---

[3] Any amount less than that would inure to PLM's benefit in a sale, because it would mean that much less of the net proceeds would be required to satisfy Delray's outstanding capital, leaving more to distribute to the Participants.

furnish the financial information to PLM *for the purpose of determining whether PLM would make an offer on the property.* Thus, its failure to do so would not compel the relief requested by PLM.

PLM relies on *PL Lake Worth Corp. v. 99Cent Stuff-Palm Springs, LLC*, 949 So. 2d 1199 (Fla. 4th DCA 2007), but we conclude that it is distinguishable. There, we held an implied duty of good faith applied to require a landlord to supply information necessary to a tenant to determine whether to exercise its option to renew a lease, where the amount of the lease payments were not specified in the contract. The tenant signed a very favorable lease with an option to renew in five years at a specified base rate plus an unspecified charge for common element maintenance and taxes. The lease required the tenant to exercise the option approximately six months prior to the expiration of the initial term. Before the option renewal date, the tenant asked for information regarding the estimated expenses, but the landlord failed to provide the information. After the option date had passed without the tenant exercising it, the landlord filed an action seeking a declaration that the option had expired and the tenant was required to vacate the premises at the end of the initial term. In response, the tenant filed its own action for declaratory judgment and injunctive relief to obtain the information needed to exercise the option. The trial court must have ordered the production of that information during the pendency of the claim, as our court said, "Within hours after the owner disclosed the maintenance and tax information pursuant to court order," the tenant exercised its option. 949 So. 2d at 1201. Our court held that the landlord had an implied duty of good faith to provide the information that the tenant needed in order to make an informed decision whether to exercise the option. Because the landlord breached the contract by failing to provide the information, it could not terminate the lease when the tenant belatedly exercised its option to renew.

*99Cent* is distinguishable, because the contract in that case set how to calculate the lease payment amount on renewal but failed to provide the actual amounts so that the total payment would be known to the tenant. Therefore, without knowing the estimated amount of common maintenance expenses and taxes the tenant would not know what its obligation would be if it renewed. In contrast, the PPA set a minimum, not a maximum, amount for an affiliate contract offer. PLM would not have exercised its right at the minimum price. Therefore, it was entirely up to it as to what it would offer to effect the forced sale/buyout provision. In making an affiliate offer, it was acting at arms-length and for its own interests.

14

Moreover, in *99Cent* the tenant intended to renew its lease and even sought an injunction to require the landlord to supply the information, exercising its option to renew just hours after receiving it. Here, not only did PLM *not* allege in its suit that it would make an affiliate offer, later in the proceedings when it did receive the rent rolls and then again when the net cash flow accountings were complete, it did not make an offer.

We thus agree with the trial court that Delray had no obligation, express or implied, to furnish accountings for the purpose of PLM determining an offering price for the property. To the extent that Delray had a duty to account for net cash flow for the purpose of distributions to the Participants, together with the resulting determination of outstanding capital, the trial court found that Delray did have an obligation to provide an accounting to determine whether distributions were owed to the Participants. That has now been accomplished, and the accounting showed that PLM was not entitled to any distributions, nor, given the size of the outstanding capital of owner, would they be entitled to any into the future. Because of that fact, the trial court exercised its discretion and determined that Delray was not responsible for a further full accounting at Delray's expense. Instead, Delray and SOSQ must furnish the financial records on the properties to PLM and SDI at their request to complete an updated accounting, should they so desire. The court, however, did require that an accounting of net proceeds must be made upon a refinancing or sale of the property. We think the trial court's resolution regarding the obligation of future accounting was within its discretion.

Even if an accounting was required for the purposes of a PLM affiliate making an offer to purchase the property, the trial court determined that the specific relief requested by PLM was never pled nor tried by implied consent, and it would not be equitable to grant such relief. We agree. At the trial in 2013, PLM sought to be permitted to make an offer of purchase based upon the conditions as they existed in 1995/1996, i.e. the outstanding capital then allowed. This relief was never requested. Indeed, while PLM claims that it would have purchased the shopping center in 1995, in its declaratory judgment action filed in 1998 it alleged that it needed the information in order to determine *whether* to make an offer, not that it intended to make an offer. Significantly, it also did not bring an action for breach of contract on the grounds that Delray and SOSQ had wrongfully terminated the agreement and refused to entertain any offer of purchase. That Hahamovitch testified in 2013 that he would have made an offer of $8.8 million in 1995/96 and had the ability to do so, was appropriately deemed by the trial court to be based on pure speculation, or, we might add, 20/20 hindsight. If he would have, and could have, made such an offer in 1995, he did not do so then or even when the court

determined in 2004 that Delray and SOSQ could not rescind the contract. It was not until after the accounting showed that PLM would not have been entitled to any profit distribution that Hahamovitch claimed that he would have made an offer in 1995/96.

The complaint for declaratory judgment did allege that the Owners should be deprived of their contractual Rate of Return until the information demanded was furnished. However, the court already rejected such relief as contrary to the agreement. Since the complaint alleged that PLM could not determine whether to make an offer until it received such information, and the prayer for relief simply requested that the court determine the validity of the agreement together with PLM's rights thereunder, we do not think that it provided sufficient notice to Delray and SDI that PLM would seek a buy-out based on 1995 prices.

We acknowledge those cases, such as *Circle Finance Co. v. Peacock*, 399 So. 2d 81 (Fla. 1st DCA 1981), relied on by PLM, which hold that in equitable actions the court is not limited by the prayer for relief but can shape the relief necessitated by the issues and the proofs. But, in equity, the trial court can grant *or* deny such relief. In this case, the court denied the relief, not only because the specific relief requested was not expressly pled but also because given the passage of time, as well as the speculation which would have to be undertaken to grant such relief, it would be inequitable. The court did not abuse its discretion.

For the foregoing reasons, we affirm the final judgment of the trial court.

STEVENSON, J., and LINDSEY, NORMA S., Associate Judge, concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***